# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BRIAN E. DAVIS,

                          Plaintiff,

v.                                                Case No. 13-CV-982-JPS

CITY OF MILWAUKEE, ART DAHLBERG
and STEPHEN CHALSTROM,

                          Defendants.                    ORDER

Before the Court are the parties' cross-motions for summary judgment (Docket #51, #58) and post-interlocutory appeal supplementary briefs addressing qualified immunity (Docket #116, #119). The Court will grant the defendants' motion for summary judgment in all material respects and deny the plaintiff's motion for summary judgment, for the reasons outlined below.

1.      BACKGROUND

The plaintiff, Brian E. Davis ("Davis"), filed a *pro se* complaint on August 29, 2013, alleging various causes of action related to municipal citations he received from the City of Milwaukee ("the City") concerning properties that he owned. (*See* Docket #1). Finding the plaintiff's complaint deficient in certain respects, the Court ordered him to file a second amended complaint curing those deficiencies. (*See* Docket #35). The plaintiff did so on December 23, 2013. (Docket #36). On February 14, 2014, the Court issued an order that, *inter alia*, directed the Clerk of Court to docket the plaintiff's second amended complaint (thus making it the operative complaint in this matter), and dismissed for lack of standing "the portions of [Davis's] claims predicated upon the property located at 4741 N. 69th Street, Milwaukee, Wisconsin." (Docket #43).

The plaintiff's remaining claims are a mix of state and federal law causes of action. As to the federal claims, the plaintiff alleges that: (1) agents of the City have "invaded [his] private residential properties at least ten times without his permission and without a warrant of any kind," in violation of the Fourth Amendment (Docket #44 at ¶¶ 35, 37); (2) various actions of the defendants--namely, the alleged searches of his residence and the resulting citations and municipal court cases—"demonstrate a pattern of personal animus against [him] and support a class of one discrimination claim against the defendants," under the Equal Protection Clause of the Fourteenth Amendment, *id.* at ¶ 44; (3) the defendants, "absent legal process or even judicial review," added $650.00 to the plaintiff's 2012 property tax bill (and later collected that amount), which was a taking in violation of the Fifth Amendment, *id.* at ¶¶ 48-51, 65; and, (4) the defendants have "abused the prosecutorial machinery of the municipal court to punish, harass[,] and retaliate against [him for exercising] his constitutional and statutory rights to be free from warrantless searches," and this allegedly malicious and retaliatory prosecution violates the Fourth and Fourteenth Amendments, *id.* at ¶¶ 43-47, 52-55.[1]

The plaintiff alleges an amalgam of state law claims that are both interrelated to his federal claims, and independent of them. First, the plaintiff alleges that the warrantless searches of his property violated: (1) Wisconsin's constitutional analog to the Fourth Amendment, *see* Wis. Cons. art. I, § 11 (Docket #44 at ¶ 37, 67); (2) a variety of Wisconsin statutes—Wis. Stat.

---

[1] The Court has collapsed Count Three and Count Five of the plaintiff's second amended complaint—which are titled "Abuse of Process" and "Right to redress, remedy, and due process," respectively (Docket #44 at 8,10)—because both counts are somewhat amorphous and overlapping; thus, it seems sensible to discuss, and resolve, those counts together.

§§ 66.0119(2), 844.01(2), 995.50(2)(a), and 943.13(1m)(b) (Docket #44 at ¶¶ 38-41); and, (3) Milwaukee City Ordinance No. 200-11(2)(a), (b) (Docket #44 at ¶ 42). Second, the plaintiff alleges that the City has violated the defendant's rights by violating a 2002 decision of the Wisconsin Appeals Court which found in his favor regarding residential code enforcement. *Id.* at ¶ 69. Third, the plaintiff requests an award of damages under Wis. Stat. § 895.043 (which provides for punitive damages) for the defendants "repeated, deliberate and flagrant violations of [P]laintiff's statutory and constitutional rights under Wisconsin law." *Id.* at 15.

The parties filed cross-motions for summary judgment in March of 2014. (*See* Docket #51, #58). After full briefing on the matter, the Court denied both parties' motions, noting that "the record in this case is not sufficiently well-developed with regard to the four factors to be considered in determining whether an area constitutes the curtilage of a home." (Docket #79) (citing *United States v. French*, 291 F.3d 945, 951-52 (7th Cir. 2002); *United States v. Dunn*, 480 U.S. 294, 302-03 (1987)). Defendant Stephen A. Chalstrom ("Chalstrom") filed a notice of appeal that same day; Chalstrom appealed the "portion of [the Court's] order…denying him summary judgment on the ground of qualified immunity." (Docket #80).

On December 23, 2014, the Seventh Circuit dismissed Chalstrom's appeal for lack of jurisdiction, finding that this Court had not expressly ruled on the defense of qualified immunity because it had identified a fact dispute. *See Davis v. Chalstrom*, 595 Fed. Appx. 627, 629-30 (7th Cir. 2014). The Seventh Circuit suggested that "[o]ne approach the court may wish to consider, as it would obviate the need for trial on the issue of curtilage, is to assume that Chalstrom walked on the curtilage of Davis's property." *Id.* at 630. If this Court were to do so, the only thing remaining would be "the purely legal

question…[of] whether Chalstrom walked on Davis's curtilage in a way that violated clearly established law." *Id.*

After the Court received the Seventh Circuit's mandate (*see* Docket #103), the Court held a status conference with the parties on February 26, 2015. (Docket #105, #110). During the conference, the Court heard arguments from the parties on how best to proceed. *Id.* After hearing the parties' arguments, the Court gave the plaintiff thirty (30) days to obtain a lawyer and instructed the defendants to file a short memo about Chalstrom's conduct—*i.e.,* where he went on the plaintiff's property—if the plaintiff failed to obtain a lawyer. *Id.* The Court also stated that it would not permit the plaintiff to amend his complaint this late in the proceedings and would not rule on his outstanding motions until he obtained counsel. *Id.* On March 18, 2015, the plaintiff filed a letter with the Court indicating that he had obtained counsel; however, counsel would only assist the plaintiff *if the matter went to trial.* (Docket #111).

On April 16, 2015, the Court stated that it would "proceed in a manner similar to that suggested by the Seventh Circuit" and resolve the outstanding qualified immunity issue by "assum[ing] that the defendants walked on the curtilage of Davis's property and analyz[ing] whether the defendants are entitled to qualified immunity in light of that assumption." (Docket #112 at 4). To that end, the Court ordered each party to file a ten-page supplemental brief on qualified immunity; the parties were also encouraged to "meet and confer about the facts pertinent to this issue—i.e., where exactly did Chalstrom go on the property—so that the parties may identify those facts that are in dispute and those that are not." *Id.*

Consistent with the Court's order, the parties filed supplemental briefs (*see* Docket #116, #119) addressing qualified immunity. The defendants also

Case 2:13-cv-00982-JPS   Filed 08/21/15   Page 4 of 40   Document 126

submitted supplemental proposed findings of fact (Docket #120), and a supplemental affidavit from Chalstrom (Docket #121). The plaintiff thereafter moved to suppress the defendants' supplemental facts and affidavit. (*See* Docket #124).

Having laid out the procedural history, the Court now turns to its discussion of the parties' cross-motions for summary judgment. The Court will begin by setting out the underlying facts, turn next to the applicable legal standard for summary judgment and qualified immunity, and conclude by analyzing each of the parties' arguments for or against summary judgment on each of the plaintiff's claims.

2.      FACTS[2]

The plaintiff owned multiple rental properties in the City of Milwaukee. Two of those properties—rental houses— are the subject of the instant matter; one house is located at 5265 North 58th Street (hereinafter "58th Street"), and the other is located at 3616 North 61st Street (hereinafter "61st Street"). The plaintiff's Fourth Amendment claims arise from the warrantless inspection of those properties by the City of Milwaukee Department of Neighborhood Services (hereinafter "DNS").

Before discussing the facts offered by the parties as to each property, however, the Court will briefly discuss DNS's building inspection scheme *writ large.*

---

[2] The facts are summarized based on the parties' proposed findings of facts, and, in some instances, the plaintiff's *pro se* Second Amended Complaint. In addition, the Court has endeavored—to the extent possible—to synthesize the relevant portions of the voluminous—and often duplicative—materials the plaintiff filed in this matter.

The Department of Neighborhood Services is charged with, *inter alia,* enforcing various City of Milwaukee Ordinances that govern residential and commercial properties within the city. As relevant here, one such ordinance—the Milwaukee Vacant Building Registration Program ordinance—dictates what a property owner must do if his or her property has been left vacant for 30 days or more. *See* Milwaukee City Ordinance No. 200-51.7. Namely, the property owner must register the building with DNS, and provide the City access to the property so it can inspect the condition of the exterior and interior of the premises. *Id.* Should a property owner fail to comply with the above-mentioned requirements, the owner faces monetary penalties as well as municipal court prosecution. Milwaukee City Ordinance No. 200-51.10. In addition to those penalties, the ordinance also states that non-compliance may result in the department petitioning a court for a special inspection warrant to enter the owner's property. Milwaukee City Ordinance 200-51.10.5.

Notwithstanding the foregoing, the general approach that DNS took with respect to inspections of rental properties (vacant or otherwise) was not to seek a warrant or "owner permission to conduct an inspection of the exterior of rental premises." (Docket #53 at 5). Instead, DNS's *de facto* policy was to operate on a "sort of cable guy rule" whereby "if the cable guy [could] go there or if the city services such as sanitation or some other services could go there, there's no expectation of privacy to prohibit an inspector to go there." *Id.* Consistent with that *de facto* policy, then, DNS inspectors would not go through a locked gate, around a fence, or walk past a "No Trespassing" sign when inspecting a property. *Id.* At 5-6.

Having laid out the enforcement scheme underlying the inspections at the plaintiff's properties, the Court will now discuss the facts underlying the inspections the plaintiff's two properties.

### 2.1    58th Street Inspections and Subsequent Litigation

In 2005, inspectors from the City of Milwaukee's Department of Neighborhood Services ("DNS") performed a series—five times in total—of building code inspections of 58th Street. (Docket #53 at 1-2) (Docket #60 at 2). The inspections were conducted without a warrant and without contacting the plaintiff or his tenant. (Docket #53 at 2, 4); (Docket #60 at 5). The inspections were performed by examining the exterior of the house, which involved walking around the premises. (Docket #53 at 1). In June or July of 2005, an inspector, Robert Bates ("Bates"), wrote an order requiring the plaintiff to replace defective siding at that address; during his inspection, Bates also observed other visible defects at 58th Street that were included in the order. *Id.* at 2. In mid-July, after reinspecting the property and observing that the defects the plaintiff was ordered to remediate still remained, a supervisor with DNS signed a complaint relating to the property. (Docket #53 at 4). That complaint would be referred to the city attorney's office for prosecution in municipal court. *Id.*

On September 8, 2005, 58th Street was again reinspected by another DNS employee, this time in preparation for the municipal court case against the plaintiff. *Id.* at 2. The nature of the inspection was virtually identical to the inspections performed by Bates—*i.e.,* the inspector walked around the exterior of the house, using driveways, sidewalks, paths, and perhaps walked on the grass. *Id.* During this reinspection, the DNS inspector found that 58th Street was now in compliance with the applicable building codes.

*Id.* at 2-4.[3] Consequently, the municipal court case against the plaintiff was dismissed by the City in December of 2005. (Docket #60 at 2). However, because a reinspection occurred, Davis was charged a $125.00 reinspection fee, which was assessed on the tax roll for the property. (Docket #53 at 4); (Docket #44 at 15); (Docket #60 at 3).

Shortly thereafter, the plaintiff filed a series of state lawsuits regarding the DNS inspections of 58th Street. (*See* Docket #44 at 4); (Docket #55 at 1-3). As relevant here, one of those cases challenged the inspections under the Fourth and Fourteenth Amendment, as well as the Wisconsin Constitution. (Docket #55, Ex. E). Ultimately, the Wisconsin Court of Appeals affirmed a Milwaukee County Circuit Court order dismissing the plaintiff's claims regarding the 58th Street inspections. *See Davis v. City of Milwaukee*, 330 Wis. 2d 835, 794 N.W.2d 928 (Wis. App. Ct. 2010).

### 2.2    61st Street Inspections

Before discussing the scope and the particular details of the inspections of 61st Street, the Court finds it prudent to describe, with particularity, the physical layout of the plaintiff's three-bedroom house on 61st Street.[4]

During all of Chalstrom's inspections, 61st Street was surrounded on three sides by a wooden fence, which enclosed much of the backyard. There

---

[3]However, the plaintiff states that he did not make any modifications to the 58th Street property between the initial inspection and the September 8, 2005 inspection, because he "believed there were no defects and the inspection searches were illegal." (Docket #65 at 5).

[4]The Court's description of the property is derived from the various diagrams, pictures, and documentary evidence filed by the parties; the physical layout of the property is, in all material respects, undisputed. Accordingly, the Court will cite to the record only when necessary.

was no fence or gate, however, that prevented entry to the backyard from the south side of the house. That side had a concrete walkway that ran from the public sidewalk in front of the house, through the front yard, along the side of the house, and into the backyard. The section of walkway that ran along the side of 61st Street—*i.e.* parallel to the house itself—was only 18"away from the house on its nearest side. The walkway was surrounded on either side by a stretch of grass that also continued into the backyard.

61st Street was separated from property nearest to the walkway by a fence—erected by the neighboring homeowner—that was about ten feet south of 61st Street, and less than eight feet from the far side of the walkway. The neighbor's fence ran the length of the side yard and continued all the way to the alley behind the house, where it connected to the fence enclosing the backyard of 61st Street.

The backyard of 61st street has a grass lawn and a small deck off the back of the house. A garage sits in the southeast corner of the property and faces the alley behind the house. There is a locked gate between the garage and the rear (east) fence that provides access to the backyard from the alley. The plaintiff contends that there was a "No Trespassing" affixed to the back gate at some point in time prior to Chalstrom's inspections (*see* Docket #65 at 1); however, it is undisputed that the sign was not present during any of the inspections performed by Chalstrom. (*See, e.g.,* Docket #124-2 at 3).

During each of Chalstrom's inspections there *was* a "No Trespassing" sign hanging in one of the two front windows of the house; specifically, the window closest to the walkway leading to the backyard.

Having described the premises in detail, the Court now turns to the facts underlying the plaintiff's Fourth Amendment claim relating to 61st Street.

In May of 2011, the plaintiff defaulted on the 61st Street mortgage (Docket #53 at 7), and shortly thereafter (in June 2011), the current tenants vacated the premises. (Docket #59 at 25). (*See also* Docket #72 at 11). It was at this time—namely, when the house became unoccupied—that the plaintiff placed a "No Trespassing" sign in the front window. (Docket #65 at 1). Between June 2011 and October 2013 (when the lender obtained a judgment of foreclosure on the property), 61st Street remained vacant and unoccupied. (Docket #53 at 10); (Docket #72 at 11) ("This property was vacated in June, 2011 and plaintiff abandoned the property shortly after putting up the No Trespassing signs a few months later.").

On March 6, 2012, a DNS inspector unsuccessfully attempted to access 61st Street to conduct an inspection pursuant to the Milwaukee Vacant Building Registration Program ordinance described above. (Docket #60 at 3); (Docket #62, Ex. I). Because DNS was unable to inspect the property, it issued an "Order to Correct Condition," which required the plaintiff to permit an inspection of the property on April 11, 2012; and, failure to do so, according to the order, would "result in prosecution, which [would] include [DNS] applying for a special inspection warrant pursuant to City Ordinance 200-11." (Docket #62, Ex. I).

Because the plaintiff failed to comply with the DNS order to permit inspection of his property, Chalstrom went to the property on August 8, 2012, to inspect the premises to determine if the property complied with the City's building codes. (Docket #53 at 7); (Docket #60 at 3). Chalstrom did not obtain a special inspection warrant to search the premises, nor did he contact the plaintiff prior to the inspection to obtain the plaintiff's consent. (Docket #60 at 5).

Chalstrom states that he began his inspection of the property by walking up to the front door and knocking to determine whether the property was indeed vacant. (Docket #56 at 3). After receiving no response to his knock, Chalstrom left a business card in the door and issued a right of entry order—that order required the plaintiff to allow inspection on September 6, 2012. *Id.* Chalstrom then proceeded to inspect the exterior of the house and "associated structures." *Id.* Chalstrom inspected the exterior of the house (the front and the back), the deck (in the backyard), and the garage (*see* Docket #121 at 2-5), and observed twenty-seven (27) code violations.[5]

To conduct the aforementioned inspection,[6] Chalstrom walked along the walkway on the south-side of the house, proceeding from the front of the house to the backyard. (Docket #56 at 3). And, Chalstrom states that at times he stepped off the walkway and onto the grass in the backyard to inspect the porch, the fence, and the exterior (in the rear) of 61st Street. *Id.* at 2-5. Chalstrom states that he did not, however, walk across the backyard to inspect the garage, and instead inspected that from the alleyway behind the house—either walking to the alley or driving there. *Id.* at 4; (Docket #56 at 3). Chalstrom's affidavit originally stated that he did not walk by any "No Trespassing" signs "on the lawn or anywhere else outside the house" (Docket

---

[5] Those code violations included: "unpainted wooden surfaces, holes in fencing, rotted porch guardrail wood, defective porch guardrails, defective porch stair treads, broken wooden fencing, [and] a missing handrail on the service walk steps." (Docket #53 at 8); (Docket #121-2 at 2-5) (copy of the DNS inspection report).

[6] These facts are taken from the original and supplemental affidavit of Chalstrom. The plaintiff takes issue with these facts for various reasons (*see* Docket #124-2), but he does not offer his own version of proposed facts regarding the inspection, instead questioning the veracity of Chalstrom's affidavit, *id.* at 4-5.

#56 at 2), although in his supplementary affidavit, this assertion is not repeated.

As a result of Chalstrom's inspection, an Inspection Report and Order to Correct Condition was issued to the plaintiff, requiring him to "correct each violation…within 90 days of the service of [the] order." (Docket #121-2 at 2); (Docket #60 at ¶ 10); (Docket #53 at ¶ 59). Chalstrom returned to 61st Street on August 28, 2012, after a neighbor called and reported he or she had found his business card which had blown away from the plaintiff's house. (Docket #53 at ¶ 52). Chalstrom checked on the property to confirm it was secure; he did so by walking up the sidewalk to the front door. *Id.*

On September 6, 2012 (the date the plaintiff was supposed to permit inspection pursuant to the right of entry order), Chalstrom returned to the property. *Id.* at ¶ 53. During this visit, Chalstrom walked around the exterior of the house, and perhaps on the grass, "to ensure no one was present in the backyard who might allow him to enter the home." *Id.* Finding no one, Chalstrom left. *Id.* Afterwards, Chalstrom issued a municipal citation to the plaintiff for failing to permit inspection of 61st Street. (Docket #62-1 at 6); (Docket #60 at ¶ 11). The municipal citation required the plaintiff to appear in court on February 14, 2013. *Id.*

Chalstrom returned to 61st Street multiple times over the course of the thirteen months. Specifically, he returned: (1) on September 17, 2012, to verify vacancy, and he did so by approaching the front door and knocking; (2) on January 16, 2013, to reinspect for code violations, and he did so by walking around 61st Street in a similar manner to the August 8, 2012 inspection; (3) on March 25, 2013 "to verify the condition of the property for the complaint in Municipal Court," and he did so by walking around 61st Street in a similar manner to the August 8, 2012 inspection; and (4) on October 1, 2013, to

prepare to testify at the municipal court proceeding and refresh his memory about the violations he had previously observed, and he did so by walking around 61st Street in a similar manner to the August 8, 2012 inspection. (Docket #53 at ¶¶ 54-57).

After Chalstrom's first inspection on August 8, 2012, and before his last on October 1, 2013, a foreclosure action was filed against the plaintiff (on December 20, 2012). (Docket #55-3). In the complaint, which discusses the foreclosure proceedings, it states that the plaintiff was in default since May of 2011, the property was not the homestead of the plaintiff, and that the mortgagee sought to protect its interests in the premises (to prevent waste). *Id.*

The municipal citation issued by Chalstrom on September 6, 2012, was eventually dismissed on March 19, 2013. (Docket #60 at ¶ 15). A second municipal case was initiated against the plaintiff for those violations, and a summons and complaint was issued on July 10, 2013. (Docket #62-1 at 12); (Docket #53 at ¶ 59). Eventually, the municipal case against the plaintiff was dismissed on the City's motion "because the defendant in that action, B. Davis Investment Co. LLC, was not the proper party as ownership of the property had been transferred to Brian Davis in 2011." (Docket #53 at ¶ 58); (Docket #60 at ¶ 20).

As noted above, Davis alleges various federal and state law claims as a result of the inspections of his properties, and the efforts undertaken by the City in municipal court. Both parties have moved for summary judgment on all of the plaintiff's federal claims; and, as to the plaintiff's Fourth Amendment claims, the defendants argue that they are entitled to qualified immunity. The plaintiff moves for resolution of his state law claims on the merits while the defendants request that—assuming the Court rules in their

favor on the plaintiff's federal claims—the Court decline to exercise supplemental jurisdiction over those claims.

The Court now turns to the legal standard applicable to summary judgment and qualified immunity.

3.    SUMMARY JUDGMENT LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, — F.3d —, 2015 WL 499571, at *5 (7th Cir. Feb. 6, 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 2015 WL 499571, at *5. When analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *See Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989).

4.	DISCUSSION

As noted above, the plaintiff has alleged a variety of federal and state law claims. The Court finds it wise to first address the gravamen of the plaintiff's suit against the defendants—that the warrantless inspections of 61st Street violated the Fourth Amendment. The Court will then discuss the plaintiff's Fourth Amendment claim for warrantless inspections of 58th Street and the plaintiff's claims relating to the inspections of his properties collectively. Afterwards, the Court will turn to the remainder of the plaintiff's federal claims. The Court will then conclude by addressing the plaintiff's state law claims.

### 4.1	The Plaintiff's Fourth Amendment Claim Against Chalstrom for Warrantless Inspections of 61st Street

The Court instructed the parties to file supplemental briefs addressing whether Chalstrom was entitled to qualified immunity for his warrantless inspections of 61st Street. The Court will begin by setting out the legal standard for qualified immunity—which frames the Court's analysis of the plaintiff's Fourth Amendment claim against Chalstrom—and then turn to analyzing the merits of the plaintiff's claim.

#### 4.1.1	Qualified Immunity Legal Standard

Qualified immunity is available when a defendant's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015). Qualified immunity is not a defense, it is an immunity from suit, *i.e.*, an entitlement not to stand trial. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, the Supreme Court has repeatedly emphasized the importance of resolving qualified immunity at the earliest possible stage in litigation. *Pearson*, 555 U.S. at 232.

Case 2:13-cv-00982-JPS   Filed 08/21/15   Page 15 of 40   Document 126

A court must answer two questions to determine if qualified immunity applies: first, whether a constitutional right "would have been violated," *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)); and second, "whether the right at issue was clearly established at the time and under the circumstances presented." *Beaman*, 776 F.3d at 508; *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).[7] To answer the first question, "a court must decide whether the facts that a plaintiff has…shown make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).

To answer the second question—whether the right was clearly established at the time of the alleged violation—a court must determine whether the right was "defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, — F.3d —, 2015 WL 4393536, at *3 (7th Cir. July 20, 2015) (citing *Reichle v. Howards*, 566 U.S. —, 132 S.Ct. 2088, 2093 (2012)); *see Ashcroft v. al-Kidd*, 563 U.S. —, 131 S.Ct. 2074, 2083 (2011) (stating that a right is clearly established if "existing precedent must have placed the statutory or constitutional question beyond debate"). In addition, "[t]he right allegedly violated must be established 'not as a broad general proposition' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Dibble*, 2015 WL 4393536, at *3 (citing *Reichle*, 132 S.Ct.

---

[7]Prior to 2009, courts were instructed to analyze the questions in order, *see Pearson*, 555 U.S. at 232 (noting that *Saucier* made addressing the questions in order "a mandate"), but in *Pearson* the Supreme Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236.

at 2094); *see also City of San Francisco v. Sheehan*, 575 U.S. —, 135 S.Ct. 1765, 1775-1777 (2015).

### 4.1.2 Chalstrom is Entitled to Qualified Immunity on the For the Warrantless Inspections of 61st Street

"The Fourth Amendment guarantees the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' and subject to 'few exceptions,' it requires officers to obtain a warrant before searching a home." *United States v. Gutierrez*, 760 F.3d 750, 753 (7th Cir. 2014) (quoting *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). And, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, — U.S. —, 133 S.Ct. 1409, 1414 (2013). A home in the structural sense is not all that receives this protection; the curtilage is within this zone of protection, as well. Curtilage "is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' *Boyd v. United States*, 116 U.S. 616, 630 (1886), and therefore has been considered part of home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1974); *accord Siebert v. Severino*, 256 F.3d 648, 653-54 (7th Cir. 2001) ("Both a home and the home's curtilage—*i.e.*, 'the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home'—are within the scope of the Fourth Amendment's protection.") (quoting *United States v. Shanks*, 97 F.3d 977, 979 (7th Cir. 1996)).

Determining whether an area around the home is curtilage is a fact-intensive inquiry. *See Bleavins v. Bartels*, 422 F.3d 445, 449 n.4 (7th Cir. 2005). The Supreme Court outlined a four-factor test to determine whether an area constitutes the curtilage of the home in *United States v. Dunn*, 480 U.S.

Case 2:13-cv-00982-JPS   Filed 08/21/15   Page 17 of 40   Document 126

294, 301 (1987). The four factors a court must consider are: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.*

After establishing the aforementioned factors, however, the Court in *Dunn* cautioned that the four factors "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*; *see also United States v. Redmon*, 138 F.3d 1109, 1125 (7th Cir. 1998) (Flaum, J. concurring) (noting that "curtilage is a descriptive—rather than prescriptive—term in our Fourth Amendment jurisprudence. Curtilage cannot define a defendant's reasonable expectation of privacy when the very same reasonable expectation is the basis for defining curtilage in the first place").

To begin, it is important to establish what the plaintiff's Fourth Amendment claim concerns, and what it does not. It is undisputed that Chalstrom trespassed on 61st Street each time he inspected the property. But, trespasses alone are insufficient to establish a Fourth Amendment violation. *United States v. Karo*, 468 U.S. 705, 713 (1984) (noting that "an actual trespass is neither necessary *nor sufficient* to establish a constitutional violation") (emphasis added); *see Oliver*, 466 U.S. at 183 ("The existence of a property right is but one element in determining whether expectations of privacy are legitimate. 'The premise that property interests control the right of the Government to search and seize has been discredited.'") (*quoting Katz*, 389 U.S. at 353). As the Seventh Circuit has stated, "[e]very trespass, by

definition, invades someone's right of possession, but not every government trespass violates the Fourth Amendment," because "the Fourth Amendment does not protect possessory interests in land." *United States v. Kramer*, 711 F.2d 789, 794 (7th Cir. 1983) (citing *Rakas v. Illinois*, 439 U.S. 128, 143-44 n.12 (1978) and *Hester v. United States*, 265 U.S. 57 (1924)).

In addition, the searches at issue here were administrative and regulatory—and not criminal—and thus were by nature less intrusive. *See Widgren*, 429 F.3d at 584 (noting that an administrative search is "'less of an intrusion on personal privacy and dignity than that which generally occurs in the course of criminal investigation. This is a real and meaningful distinction.'") (quoting Wayne R. LaFave, 5 *Search and Seizure: A Treatise on the Fourth Amendment* § 10.1(b) (4th ed. 2004)); *cf. Camara v. Mun. Ct. Of S.F.*, 387 U.S. 523, 530 (1967) ("We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime.").

Finally, the inspection of 61st Street occurred long after the plaintiff admits that the property had become vacant and he, by his own admission, had abandoned it. (*See* Docket #72 at 11) ("This property was vacated in June 2011 and plaintiff abandoned the property shortly after putting up the No Trespassing signs a few months later."); *id.* ("…*plaintiff abandoned the property*") (emphasis in original); *see also* Brief for Appellee at 30-31, *Davis v. Chalstrom*, 595 Fed. Appx. 627 (7th Cir. 2014) (No. 14-2371) (noting that sometime in 2011 the plaintiff "gave up and abandoned [61st Street] based on ten years of continued harassment and torment by the city"). And, "a person can, through his own acts or omissions, manifest an intent to relinquish his legitimate expectation of privacy in his real property…."

*United States v. Harrison*, 689 F.3d 301, 309 (3d Cir. 2012); *see McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011).

Abandonment (not in the common law property sense, but in the privacy sense) weighs against any interest in privacy. *See Harrison*, 689 F.3d at 307. As Judge Tone stated thirty-five years ago, "[g]iven the Katz principle that the Fourth Amendment protects people and not places, ownership unaccompanied by either occupancy or any exhibition of an expectation of privacy or an intention to assert a privacy interest should not be sufficient for Fourth Amendment protection." *Wilson v. Health and Hosp. Corp. Of Marion Cnty.*, 620 F.2d 1201, 1219 (7th Cir. 1980) (Tone, J. dissenting).

Likewise, the fact that a house was not a "home" weighs against finding a reasonable expectation of privacy in warrantless searches of the property. *See Bonneville v. Kitsap Cnty.*, No. 06-CV5228, 2007 WL 474376, at *14 (W.D. Wash. Feb. 8, 2007) (noting that "the Fourth Amendment protects the structures in which a person resides, and not structures which are not occupied by the Plaintiff, where no expectation of a right to privacy can reasonably exist") (citing *United States v. Barajas-Avalos*, 377 F.3d 1030, 1057-59 (9th Cir. 2004)); *Schneider v. Cnty. of San Diego*, 28 F.3d 89, 92 (9th Cir. 1994) ("Schneider did not live in the home and, having suffered no invasion of privacy, would not have standing to complain that its curtilage was invaded without a warrant."); *United States v. Jackson*, 585 F.2d 653, 660 (4th Cir. 1978); *United States v. Potts*, 297 F.2d 68, 69 (6th Cir. 1961) ("The result is that curtilage did not exist in this case as appellant was not using the house as a residence or dwelling and the entrance of the revenue agents on the premises was not an unconstitutional invasion."); *Dean v. Duckworth*, 99 Fed. Appx.

760, 761 (8th Cir. 2004); *cf. United States v. Bunch*, No. 11-CR-136, 2012 WL 11799873, at *9-11 (N.D. Ga. Dec. 20, 2012).[8]

Against that backdrop, what Fourth Amendment protection remains for a non-resident landowner—like the plaintiff—who has never used a vacant house as a home? The answer to that inquiry is necessarily the starting point of the Court's qualified immunity analysis. But, the questions the Court must ultimately address are: (1) does an inspection of the exterior of non-resident landowner's vacant house, by walking on the curtilage, violate the Fourth Amendment?; and, (2) even if it does, was that right clearly established at the time of the searches at issue here?

The Court need not concern itself with answering the first question (more than it already has in the discussion above) because it is clear that even if Chalstrom ran afoul of the constitution, the right to be free from that injury was not clearly established at the time of the warrantless searches, here. *See Caitlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009) (noting that "where it is apparent that the alleged right at issue is not clearly established, [a court] may decide the case on these grounds without first deciding if there was an underlying constitutional violation") (citing *Pearson*, 555 U.S. at 231). Thus,

_____

[8]Justice Kagan also elaborated on this idea in *Jardines,* stating:

It is not surprising that in a case involving a search of a *home*, property concepts and privacy concepts should so align. The law of property naturally enough influences our shared social expectations of what places should be free from governmental incursions. And so the sentiment "*my home is my own*," while originating in property law, now also denotes a common understanding—extending even beyond the law's formal protections—about an especially private sphere.

133 S.Ct. at 1418-19 (Kagan J. concurring) (emphasis added) (internal quotation marks and citations omitted).

the answer to the key question the Seventh Circuit suggested this Court answer on remand—namely, whether the plaintiff can "point to case law clearly establishing that a reasonable inspector would have known that a mere visual inspection of the outside of a structure, even if done while on the curtilage and without a warrant, is an unreasonable search," *Chalstrom*, 595 Fed. Appx. at 630—is no.

The plaintiff argues that "the Court would be hard pressed to find *any* constitutional right that is *more* established than the right of a private homeowner to be free from warrantless searches by government agents." (Docket #116 at 3). And, his argument continues, "there is virtually *no case law* authorizing municipal inspectors to conduct random warrantless criminal investigations of homeowners *based on no suspicion whatsoever*." *Id.* at 4 (emphasis in original). Those statements may be true, but they are made at such a high level of abstraction—and more aptly pertain to homeowners that *live in the home in question*—that they cannot inform the Court's qualified immunity analysis in any useful way. *See al-Kidd*, 131 S.Ct. at 2084 (warning that courts should not "define clearly established law at a high level of generality").

As the defendants point out, "Mr. Davis has not come forward with a single case establishing that a non-resident landlord, as opposed to the occupant of a residential property, can assert any reasonable expectation of privacy to [sic] any portion of the yard surrounding a residence from an inspector who gains access via a walkway open to the general public." (Docket #119 at 10). Because the Court agrees, the plaintiff's Fourth

Amendment claim regarding the warrantless inspections of 61st Street must fail.[9]

True, the plaintiff has come forward with some out-of-circuit cases that support that the contours of such a right may have been established prior to the searches at issue—to wit, various cases in the Sixth Circuit, *see United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594. 601-02 (6th Cir. 1998); *Jacob v. Twp. of W. Bloomfield*, 531 F.3d 385, 392 (6th Cir. 2008). But, there is not even agreement within the Sixth Circuit as to the scope of that purported right. *See Widgren*, 429 F.3d 575, 583-84 (holding that under the facts of the case, "a property assessor does not conduct a Fourth Amendment search by entering the curtilage for the tax purpose of naked-eye observations of the house's plainly visible exterior attributes and dimensions—all without touching, entering or looking into the house"). And, in a somewhat similar case just this year, the Fourth Circuit noted that it could not resolve whether a tax assessor was entitled to qualified immunity for entering a home's curtilage (to observe the exterior of the home) because the parties were unable to "offer any caselaw involving

---

[9]The plaintiff also cites a 2002 Wisconsin Appeals Court decision for the proposition that his right to be free from building code inspections was clearly established. (*See* Docket #116 at 5). But, that decision did not establish the contours of his right to be free from such inspections under the Fourth Amendment, as the Wisconsin Court of Appeals later explicitly stated. *See Davis v. City of Milwaukee*, 330 Wis.2d 835, 793 N.W.2d 928 (table), 2011 WI App 1 at ¶7 (Ct. App. 2010) (" Contrary to what Davis argues, our decision in *B. Davis Investment*, 257 Wis.2d 939, does not expand the constitutional definition of 'reasonable expectation of privacy' such that any entry onto Davis's property constitutes a *per se* Fourth Amendment violation. In fact, *B. Davis Investment* had nothing to do with either the state or federal constitutions."). Thus, the 2002 decision neither establishes a right under the constitution, nor, therefore, does it help the plaintiff prove that right was clearly established.

facts substantially similar to [that] case." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 196 (4th Cir. 2015).

In any case, a few out-of-circuit cases a clearly established right does not make. *See Sheehan*, 135 S.Ct. at 1778 (noting that, at the very least, a plaintiff must point to "a 'robust consensus of cases of persuasive authority,'" but implying that even that may not be sufficient) (quoting *al-Kidd*, 131 S.Ct. at 2084). In the Court's view, this question is not even remotely "beyond debate." *See Carrol v. Carman*, — U.S. —, 135 S.Ct. 348, 350-52 (2014).

Indeed, an unpublished Seventh Circuit decision in 1992 explicitly *permitted* observation of the exterior of a rental residence from side service walks under facts not fairly distinguishable from the instant matter. *See Heldstab v. City of Milwaukee*, 993 F.2d 1549 (table), 1992 WL 474171, at *6 (7th Cir. 1992). There, the Court stated that "[t]he exterior of a home is generally something that is knowingly exposed to the public," and, in addition, "[n]o member of the public would have been deterred from walking along the side service walks" to observe the exterior of the residence. *Id.* Thus, the Court held that the plaintiff "did not manifest an actual expectation of privacy with regard to the exterior of his building; but, even if he secretly had one, it is not one that is objectively reasonable." *Id.* (citing *California v. Ciraolo*, 476 U.S. 207, 215 (1986).

True, the plaintiff in *Heldstab* had not placed any "No Trespassing" signs on his property, *id.*, and, here, there is evidence that the plaintiff did so. But, the placement of those signs by the plaintiff is insufficient, standing alone, to distinguish *Heldstab*; signs stating "Private Property" or "No Trespassing" do not, by themselves, create an impenetrable privacy zone. *See, e.g.*, *Bartels*, 422 F.3d 445, 454 (7th Cir. 2005); *Oliver*, 466 U.S. at 182-83.

The right which the plaintiff claims is clearly established is neither clearly established nor reasonably beyond debate; this is evidenced by various cases outside the Seventh Circuit. *See Bonneville*, 2007 WL 474376, at *14 (noting that "courts have held that visits by building inspectors, even though the inspectors entered the house or the curtilage without the owner's consent, did not violate the Fourth Amendment when the inspectors entered the home in a minimal way for the purpose of enforcing a code provision") (citing *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994) and *Widgren*, 429 F.3d at 583-85); *see also Palmieri v. Lynch*, 392 F.3d 73, 84 (2d Cir. 2004); *Nikolas v. City of Omaha*, 605 F.3d 539, 545-46 (8th Cir. 2010); *Covey*, 777 F.3d at 196 (noting qualified immunity for the tax assessor was a "closer call" given the lack of case law); *Schneider*, 28 F.3d at 91-92.

In light of the foregoing, the Court finds that Chalstrom is entitled to qualified immunity for the warrantless inspections of 61st Street because the right to be free from such conduct was not clearly established at the time of Chalstrom's searches (and still, perhaps, is not).[10]

---

[10]It is true that *Jardines*—a curtilage-centric case that helps the plaintiff's position—was handed down after Chalstrom's first inspection of 61st Street, but before his last. Yet, even if *Jardines* cleared up the reinvigoration of the trespass line of Fourth Amendment cases that began in *Jones, but see Gutierrez*, 760 F.3d at 757, however, 61st Street entered formal foreclosure proceedings in late 2012 and in the court documents, as the defendants point out, the lender stated that it had an interest in preserving 61st Street. The lender's right to enter the premises to secure its interest and inspect it for waste or assess its condition would have severely lessened any expectation of privacy the plaintiff had in the exterior of the house or the curtilage; and, more importantly, lessened whatever import *Jardines* had on the constitutionality of the warrantless searches that occurred after it was handed down.

### 4.2 The Plaintiff is Collaterally Estopped from Alleging a Fourth Amendment Claim for the Inspections of 58th Street

The defendants argue that the plaintiff's Fourth Amendment claim relating to the inspections of 58th Street is barred by issue preclusion (or collateral estoppel) because the plaintiff "made exactly the same claim in his earlier case in state court." (Docket #54 at 15). The plaintiff offers no facts or arguments to contradict the defendants' position (*see* Docket #64 at 7) (observing only that the defendants' assertion of issue preclusion is "chutzpah beyond belief"), nor does he dispute that the 2010 decision of the Wisconsin Appeals Court resolved a Fourth Amendment claim he brought against the City for inspections of 58th Street. Thus, the defendants are entitled to summary judgment on this claim based on issue preclusion.

"Issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Dexia Crédit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010) (citing *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). A prior state court judgment is entitled to the same preclusive effect in federal court, that it would receive in state court. *See Easterling v. Moeller*, 418 Fed. Appx. 495, 497 (7th Cir. 2011) (citing *Allen v. McCurry*, 449 U.S. 90 (1980) and *Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006)). In Wisconsin, "issue preclusion, also called collateral estoppel, bars the relitigation of a factual or legal issue that actually was litigated and decided in an earlier action." *Virnich v. Vorwald*, 664 F.3d 206, 215 (7th Cir. 2011) (citing *Northern States Power Co. v. Bugher*, 525 N.W.2d 723, 727, 189 Wis.2d 541 (1995)).

Here, it is undisputed that the plaintiff litigated a Fourth Amendment claim all the way through trial (before ultimately being dismissed prior to a verdict) against the City in *Davis v. City of Milwaukee*, and that case was upheld on appeal. *See* 2011 WI App 1 at ¶15. The trial court issued a final

judgment on the merits—hence, allowing the plaintiff to appeal—and the issue is identical to the claim the plaintiff asserts here—namely, whether the inspections of 58th Street violated the Fourth Amendment. *See Davis*, 2011 WI App 1 at ¶2 (noting that Davis's claim was "that City inspectors entered this property several times throughout 2005 without permission or a warrant, cited him for various code violations, and then filed a frivolous lawsuit against him in municipal court," in violation of, *inter alia*, the Fourth Amendment).

The four requirements for collateral estoppel to apply to a § 1983 claim are met, here. Namely, that: (1) "the issue must be the same as that involved in the prior judicial proceeding"; (2) "the issue must actually have been litigated"; (3) "the issue must have been resolved"; and (4) "the issue's determination must have been necessary to the judgment in the prior proceeding." *Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987). First, as established above, the issue is identical. Second, the issue was actually litigated through trial, and resolved on appeal; in addition, the Supreme Court of Wisconsin denied the plaintiff's petition for review of the appeals court's decision. Third, the issue was resolved by the trial court and again by the appeals court, with the latter stating that: "The evidence adduced at trial did not establish that any City employee entered any property on which Davis had a reasonable expectation of privacy." *Davis*, 2011 WI App 1 at ¶15. And, the issue in the prior case was essential to its finding, given that the plaintiff's entire case involved the Fourth Amendment claim.

For all of the above reasons, the Court is obliged to grant the defendants' motion for summary judgment on the plaintiff's Fourth Amendment claim pertaining to the warrantless inspections of 58th Street.

**4.3** **The Defendants are Entitled to Summary Judgment on the Plaintiff's Fourth Amendment Claims Against Art Dahlberg and the City of Milwaukee**

The plaintiff appears to allege—but fails to provide facts or attempt to prove—a Fourth Amendment claim against Art Dahlberg ("Dahlberg") individually for the warrantless inspections of his property. The plaintiff's claim fails because, as the defendants point out, the plaintiff has come forward with no evidence showing Dahlberg was personally involved in the inspection of 58th Street or 61st Street (*see* Docket #54 at 16). Moreover, to the extent that the plaintiff's claim is premised on the idea that Dahlberg violated his rights under a theory of *respondeat superior*—which, in the Court's estimation, is what the plaintiff attempts to assert—that theory goes nowhere. This is because, "[t]he doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Lacking facts or evidence showing Dahlberg's personal involvement in the warrantless inspections of the plaintiff's properties, Dahlberg is entitled to dismissal of the plaintiff's Fourth Amendment claims against him in his individual capacity.

Turning to the plaintiff's *Monell* claim against the City, the plaintiff also argues that the defendants have a "practice to conduct warrantless inspection searches of private property in the City of Milwaukee." (Docket #59 at 7). A policy, according to the plaintiff, that states that "as long as their inspectors don't invade an undefined curtilage, a Milwaukee resident…ha[s] no expectation of privacy in their own private property." *Id.* at 7-8. The plaintiff goes on to argue that he is entitled to summary judgment on this claim because the City's policy plainly violates the Fourth Amendment, and

any argument the City makes based on an expectation of privacy is "frivolous." *Id.* at 9.

The defendants—Dahlberg in his official capacity and the City, to be exact—argue that the City's policy is not unconstitutional on its face because the policy, and the training that building inspectors receive "is consistent with the law of this circuit." (Docket #67 at 11). Specifically, the defendants cite to *United States v. French*, 291 F.3d 945, 953 (7th Cir 2002) in support of their *de facto* policy; there, the Seventh Circuit stated that "[t]he route which any visitor or delivery man would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open." Finally, the defendants argue that "because Davis can show no underlying violation of his Fourth Amendment rights," he cannot succeed on a *Monell* claim. (Docket #67 at 11) (citing *City of L.A. v. Heller*, 475 U.S. 796 (1986)).

At the outset, the Court notes that the fact that Chalstrom is entitled to qualified immunity for his warrantless inspections of 61st Street does not immunize the defendants from a *Monell* claim. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2009). True, a municipality is immune from liability when there is no underlying constitutional injury, *see Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014), but here the Court did not answer the question of whether a constitutional injury occurred and instead found that *even if one did occur*, the right to be free from that injury was not clearly established at the time it occurred. This does not prevent *Monell* liability. *See Thomas*, 604 F.3d at 305 (noting that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict").

Notwithstanding the foregoing, and even if the Court had found a constitutional violation—which, to be clear, it did not—the defendants would be entitled to summary judgment on the plaintiff's *Monell* claim. This is so because DNS's *de facto* policy—*i.e.,* "the cable guy rule"—does not, by itself, run afoul of the Fourth Amendment. The Court agrees that, in most respects, the policy is consistent with the "implied license theory" that was articulated in *Jardines*. *See Guitierrez*, 760 F.3d 750, 756-57 (7th Cir. 2014) (noting that *Jardines* established an "implied license theory" that permitted entrance onto curtilage based on social custom). While *French*—the case the defendants rely on to support their argument that the policy is constitutional—predates *Jardines*, it is entirely consistent with its holding; namely, that a government official entering areas that society would expect others to walk on your property—up to the front door, along a side walk that is open to reach a back door, up a driveway, etc.—does not violate the Fourth Amendment.

That some of the DNS employees may misunderstand the import of this policy, or exceed its bounds by entering into protected areas of the curtilage, does not permit the plaintiff's *Monell* claim to succeed. While *Monell* permits municipalities to be held liable under § 1983, "it does not allow for liability under § 1983 on a theory of *respondeat superior* or vicarious liability." *Hoskin*, 994 F. Supp. 2d at 979 (collecting cases). "In other words, '[m]isbehaving employees are responsible for their own conduct,'" *id.* (quoting *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007)), and "units of local government are responsible only for their policies, rather than misconduct by their workers," *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007). Moreover, because the plaintiff has offered no evidence that the practice of DNS was to consistently *deviate* from this policy in a way that violated the Fourth Amendment, *see Thomas*, 604 F.3d at 303 (permitting liability for "a governmental practice or custom that, although not officially

authorized, is widespread and well settled"), the plaintiff's *Monell* claim must fail.

For all the foregoing reasons, Defendants Dahlberg and the City are entitled to summary judgment on the plaintiff's *Monell* claim.

### 4.4    The Defendants are Entitled to Summary Judgment on the Plaintiff's Equal Protection Claim

The plaintiff argues that he is entitled to summary judgment on his equal protection claim; a claim that alleges that "this is simply a case of city employees systematically and repeatedly using their official city positions to harass and torment a citizen who prevailed against the city in an earlier legal action." (Docket #59 at 10); *see id.* at 11 ("Since winning his Wisconsin Appellate Court decision against the City in 2002, Davis has been under more or less relentless attack by the City."). However, all that the plaintiff offers in support of this claim is the contention that "[t]o the best of his knowledge, no other property owner in the [C]ity has been subject to the number of warrantless invasions, unfounded charges and dismissed prosecutions which he has faced," *id.* at 12, and the conclusion that this is necessarily "*prima facie* evidence that plaintiff Davis has been singled out for special attention by the City." *Id.* at 13.

Davis offers no facts in his statement of proposed facts that support an equal protection claim, or purport to meet all of the elements of the claim. *See* Civil L.R. 56(b)(1)(C). This is grounds enough to deny the plaintiff's motion for summary judgment. *See* Civil L.R. 56(b)(1)(C)(iii); *see also Hotel 71 Mezz*, 2015 WL 499571, at *5 ("Where...the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and

demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims").

Even if the Court were to consider this claim, however, the defendants would be entitled to summary judgment because the facts before the Court and the reasonable inferences drawn from them, do not suffice to show there was no rational reason for the actions of the defendants.

To succeed on a class-of-one equal protection claim, a plaintiff must show that "state actors lacked a rational basis for singling them out for intentionally discriminatory treatment." *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015). And, "[n]ormally, a class-of-one plaintiff will show an absence of rational basis by identifying some comparator—that is, some similarly situated person who was treated differently." *Fares Pawn LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014). Lacking a comparator is not fatal, *see City of Monona*, 784 F.3d at 1120, as long as a plaintiff can "prove[] by evidence 'that the defendant deliberately sought to deprive [the plaintiff] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position.'" *Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014) (quoting *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007-08 (7th Cir. 2000)).

Here, the plaintiff falls woefully short of making the required showing. First, the plaintiff has not come forward with a scintilla of evidence proving that another similarly situated individual was treated differently by any of the defendants. Second, there was clearly a rational basis for the defendant's actions—namely, the inspections and the municipal citations issued to the plaintiff, whether dismissed or not—in that the plaintiff was *not* maintaining his property. (*See* Docket #67 at 13) ("The defendants have come forward with evidence that Chalstrom observed numerous code violations

on the property. Davis does not contest the evidence of these defects.") (internal citations omitted). The Court agrees with the defendants that "[t]here was a legitimate objective here—enforcement of municipal code regulations" meant to ensure the proper maintenance and safety of properties within the City of Milwaukee. *Id.*

In sum, the plaintiff may *believe* that the "action taken by the [City], whether in the form of prosecution or otherwise, was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective," *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995), but the plaintiff certainly has not *proven* that belief to ultimately be true. Conversely, the defendants have established that there was a conceivably rational purpose behind their actions, and thus they are entitled to summary judgment on the plaintiff's class-of-one equal protection claim. *See Fares Pawn*, 755 F.3d at 845 ("If we can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no."); *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) *cert. denied*, 134 S. Ct. 1308 (2014) (noting that "[a]ll it takes to defeat [a class-of-one] claim is a conceivable rational basis" for the plaintiff's treatment).

### 4.5    The Defendants are Entitled to Summary Judgment on the Plaintiff's Fifth (Fourteenth) Amendment Claim

The plaintiff styles his Fifth Amendment claim as "hard to frame…in terms of legal terminology because [the takings] appear to be so legally blatant and crude, *i.e.*, we're the city and we do it because we can." (Docket #59 at 21). Before proceeding further, the Court must point out that the plaintiff's claim is not cognizable under the Fifth Amendment, but the Fourteenth Amendment, since the action in question was performed by a

municipality and not the federal government. As such, the Court will thus construe the plaintiff's claim as one under the Fourteenth Amendment.

The plaintiff argues, in sum, that he is entitled to summary judgment because it is undisputed that the City collected reinspection fees for both 58th Street and 61st Street at the time that he sold the properties, and he argues the City did so without due process or judicial review. *Id.* at 21-25. The plaintiff also makes an amorphous allegation, without factual support, that the City's actions ultimately caused him to lose 61st Street. *Id.* at 24-26. All of this, the plaintiff argues, violates substantive and procedural due process because the City ultimately dismissed the municipal court cases against him—for both properties—repeatedly but "the city keeps the money…to this day." *Id.* And, according to the plaintiff, "[t]he city's actions pass the threshold of erroneous deprivation in the realm of simple confiscation." *Id.* at 26.

As with the plaintiff's equal protection claim, he has failed to support this claim with proposed facts, and he has not shown how those (or any) facts meet the element of such a claim. *See* Civil L.R. 56(b)(1)(C). Again, this is grounds enough to deny the plaintiff's motion for summary judgment. *See* Civil L.R. 56(b)(1)(C)(iii); *Hotel 71 Mezz*, 2015 WL 499571, at *5.

That aside, the parties do not argue that the facts are in dispute, and based on those facts, the defendants are entitled to summary judgment on this claim for several reasons. Liability under § 1983 "is premised on the wrongdoer's personal responsibility," *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012), and thus "[a]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sondquist*, 699 F.2d 864, 869 (7th Cir. 1983). Defendants Chalstrom and Dahlberg were not personally involved in

assessing the fees the plaintiff complains of, and thus their lack of personal involvement dooms any "takings" claim against them.

What remains is a due process claim for deprivation of property against the City. The City argues that it is entitled to summary judgment on this claim because "[u]nder governing law [of the City], a property owner has the right to challenge an administrative decision to charge reinspection fees slated to be placed on the tax bill before the charges are even placed on the bill." (Docket #54 at 19-20) (citing Milwaukee Code of Ordinances §§ 320–11-3-a and c, and Wis. Stat. § 68.10). Thus, the City's argument continues, "[t]his is all the process to which Davis is due." *Id.* at 20. The Court agrees.

Even assuming that the plaintiff was actually deprived of property, the plaintiff was provided with a process by which to remedy that violation—a predeprivation process, at that. The fact that the plaintiff did not take advantage of that process does not permit him to come back later and decry the result of his own failures. *See Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013) ("The due process clause does not permit a litigant to disdain his opportunities under state law and then demand that the federal judiciary supply a remedy."). The plaintiff may want the money back, but he had an opportunity to make that desire a reality; and that is all the process he is entitled to. *See id.* ("…Simmons does not want a hearing. He wants money. That's what the due process clause does *not* guarantee; the federal entitlement is to process, not to a favorable outcome."). The plaintiff seems to admit this is the case in his reply, stating that he "saw no point in starting a long convoluted process to get his money back," because "[h]e believed the court would protect him." (Docket #72 at 9).

Finally, the plaintiff's disjointed argument that the defendants somehow deprived him of 61st Street because of the warrantless inspections (and the municipal actions taken against him) is nonsensical at best. The property was in default *before* the inspections by Chalstrom, and a foreclosure action was filed in late 2012, in the middle of those inspections. There is simply no rational basis to conclude the City's actions had anything to do with the plaintiff's loss of 61st Street; indeed, it was his own actions (or, more aptly, his *inaction*) that resulted in the loss of that property.

Thus, the defendants are entitled to summary judgment on the plaintiff's Fifth Amendment claim, which the Court construes as a Fourteenth Amendment claim.

### 4.6 The Plaintiff's Malicious Prosecution and Abuse of Process Claims are Not Cognizable Under § 1983

The plaintiff has brought a slew of interrelated claims he titles at times "abuse of process," "due process," and "malicious prosecution." (*See generally* Docket #44, #59, #64, #72). Both the plaintiff and the defendants argue, at length, why they are each entitled to summary judgment on these claims. The Court need not delve into the parties arguments because these claims sound under state tort law and not federal law, and thus are not cognizable under § 1983.

In *Newsome v. McCabe*, the Seventh Circuit held that there is not "constitutional tort of malicious prosecution where a state provides a meaningful tort remedy for malicious prosecution." *Armstrong v. Daily*, 786 F.3d 529, 541 (7th Cir. 2015) (citing *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001)). And, the Seventh Circuit has held that "the availability of Wisconsin's tort for malicious prosecution forecloses a federal claim under § 1983 that [a defendant] maliciously launched a prosecution." *Gordon v.*

*Miller*, 528 Fed. Appx. 673, 674 (7th Cir. 2011) (citing *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) and *Newsome*, 256 F.3d at 750-51)). To the extent that the plaintiff is alleging malicious prosecution, then, he must bring these claims under state law in state court.

So too does the availability of an abuse of process tort in Wisconsin doom the portion of the plaintiff's claim alleging that the defendants engaged in tomfoolery during their municipal actions against the plaintiff. Wisconsin law provides a remedy for abuse of process, *see, e.g.*, *Kaminske v. Wis. Cent. Ltd.*, 102 F. Supp. 2d 1066, 1077 (E.D. Wis. 2000) (citing *Strid v. Converse*, 111 Wis. 2d 418, 426, 331 N.W.2d 350 (1983) and *Brownsell v. Klawitter*, 102 Wis.2d 108, 115, 306 N.W.2d 41 (1981)), and the Seventh Circuit has held that these claims are also not cognizable under § 1983 for the same reasons articulated in *Newsome*. *See Adams v. Rotkvich*, 325 Fed. Appx. 450, 453 (7th Cir. 2009) ("Similarly, and consistent with our holding from *Newsome*, we conclude that abuse of process is not a free-standing constitutional tort if state law provides a remedy for abuse of process.").

Because these claims are not cognizable against the defendants individually, or collectively, the Court is obliged to dismiss the plaintiff's abuse of process and malicious prosecution claims against them. The Court has also foregone delving into the particulars of these claims because the plaintiff's pleadings are, to be frank, all over the place as to why the defendants have committed these violations. This seems to be a theme in the plaintiff's litigation, as observed by the Wisconsin Appellate court in *Davis*'s state case concerning 58th Street:

> Davis's complaint, amended complaints, and appellate briefs, as well as nearly every other document Davis filed in this matter, contain additional claims, which generally allege bias and deceit against the judges and City attorneys assigned to his case. We spent an inestimable amount of time perusing the record in a good-faith attempt to address all issues before us, and we conclude all such allegations are unsubstantiated.

*Davis v. City of Milwaukee*, 2011 WI App 1 at ¶ 2 n.3.

Finally, to the extent that the plaintiff is alleging some remaining due process claim against the defendants for the municipal court actions against him, the Court is unable to discern what process and/or right the plaintiff was deprived of. The defendants seem to argue that the plaintiff is alleging a due process claim for denial of access to the courts. (*See* Docket #54 at 20). And, perhaps he is. (*See* Docket #64 at 15). But the plaintiff raised that *new claim* in his opposition to the defendants' motion for summary judgment. Because the claim was neither in the plaintiff's complaint, nor his motion for summary judgment, nor any other place except in his opposition, the claim is not part of this proceeding.

Even if that claim was part of this proceeding, the plaintiff's main complaint is that the City filed actions against his LLC, instead of himself, "with the aim of causing him to have to hire attorneys to defend himself." (Docket #64 at 15-16). This does not show that the defendants denied the plaintiff access to the courts (not even remotely), given that the plaintiff has been in court an uncountable amount of times litigating the inspections of his properties. And, the plaintiff likely lacks standing to complain of having to hire an attorney to defend his LLC since that entity is not a party to the instant matter. Thus, the Court is obliged to dismiss whatever remains of the plaintiff's due process claim.

### 4.7 The Court Declines to Exercise Supplemental Jurisdiction Over the Plaintiff's State Law Claims

As noted above, the plaintiff has alleged various state law claims against the defendants, the intricacies of which the Court declines to elaborate on because the Court declines to exercise supplemental jurisdiction over those claims. This is the proper course because the plaintiff has no viable federal claims remaining and his state law claims were not the focus of the plaintiff's case. *See Howlett v. Hack*, —F.3d—, 2015 WL 4433218, at *5 (7th Cir. July 21, 2015) ("This resolves all of Howlett's federal claims. What remain are his state-law [claims]. In a situation like this one, where the state-law claims have not been the focus of the litigation, the better practice is for the district court to relinquish its jurisdiction over them.") (citing 28 U.S.C. § 1367(c)(3) and *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007)); *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims.").

### 5. CONCLUSION

For all of the foregoing reasons, the Court will deny the plaintiff's motion for summary judgment and grant the defendant's motion for summary judgment in all material respects. Specifically, the defendants are granted summary judgment on the plaintiff's Fourth Amendment claims, Fourteenth Amendment class-of-one equal protection claim, and Fourteenth Amendment due process claim for the "taking" of the plaintiff's property. Because the plaintiff's abuse of process and malicious prosecution claims are not cognizable under § 1983, the defendants are not entitled to summary judgment on these claims; instead, the Court will dismiss those claims without prejudice. Finally, the Court declines to exercise supplemental

jurisdiction over the plaintiff's state law claims, and thus will also dismiss these claims without prejudice.

Accordingly,

IT IS ORDERED that the plaintiff's motion for summary judgment (Docket #58) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #51) be and the same is hereby GRANTED in all material respects, as outlined above;

IT IS FURTHER ORDERED that the plaintiff's claims for abuse of process and malicious prosecution be and the same are hereby DISMISSED without prejudice;

IT IS FURTHER ORDERED that the Court declines to exercise supplemental jurisdiction over the plaintiff's state law claims and thus those claims be and the same are hereby DISMISSED without prejudice; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of August, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge